IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

Estate of DOROTHY MARTIN; MARY
MARTIN,

        Plaintiffs,

    v.

CALIFORNIA DEPARTMENT OF
VETERANS AFFAIRS, et al.,

        Defendants.

CIV-S-02-2334 DFL-GGH

MEMORANDUM OF OPINION
AND ORDER

Plaintiff Mary Martin, individually and on behalf of the estate of her mother Dorothy Martin (collectively "Martin"), brought this suit against the California Department of Veterans Affairs and various of its officers (collectively "the Department") alleging violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and the Rehabilitation Act, 29 U.S.C. § 794.  Plaintiffs claim that the Department improperly denied Dorothy Martin admission to the Veterans Home of California ("VHC") because she suffered from

Alzheimer's disease.  Martin also asserted a claim under the equal protection clause and state law claims for negligent and intentional infliction of emotional distress.[1]

The case was tried to a jury beginning on October 11, 2005. On October 18, 2005, both parties filed motions for judgment as a matter of law.  The court granted the Department's motion in part, dismissing: (1) the equal protection and state law tort claims; (2) Mary Martin's claims under the ADA and the Rehabilitation Act because she lacked standing; and (3) the compensatory damages claims for violations of the ADA and the Rehabilitation Act because Martin did not provide evidence of intentional discrimination.  On October 20, 2005, the jury returned a verdict for the Department finding that Martin did not prove by a preponderance of the evidence that the Department discriminated based on disability.  On October 28, 2005, the Department submitted a bill of costs.  On November 4, 2005, Martin filed a renewed motion for judgment as a matter of law and a motion for new trial.  Martin's motions and the Department's

---

[1]    The court's July 22, 2003 order explains that neither the Department nor its officers are shielded from suit in federal court under the Eleventh Amendment as to the ADA and Rehabilitation Act claims.  See Lovell v. Chandler, 303 F.3d 1039, 1050 (9th Cir. 2002).  However, the court found that plaintiffs could not bring ADA or Rehabilitation Act claims against the Department officers in their individual capacities because both statutes are directed at the actions of public entities only.  See Miranda B. v. Kitzhaber, 328 F.3d 1181, 1188(9th Cir. 2003).  Finally, the supplemental state law tort claims were dismissed as to the Department and the defendants in their official capacities because of the Eleventh Amendment bar. These claims were permitted to go forward against the individual defendants in their individual capacities.

1  bill of costs are the subject of this order.

2  ## I. Judgment as a Matter of Law

3      Martin raises ten arguments in support of her renewed motion

4  for judgment as a matter of law.  Each argument is addressed

5  under a separate heading below.

6  ## A.  Facial Discrimination

7      Martin asserts that when compared to similarly-situated

8  non-disabled applicants to the VHCs, applicants with Alzheimer's

9  or dementia[2] are denied admission because of their disability.[3]

10

11      [2]  There has been some inconsistency in Martin's theory of
discrimination.  In its ruling on the summary judgment motions,
12  the court permitted the case to go forward on the view that
Martin was alleging discrimination against persons with a
13  particular disease, Alzheimer's, regardless of its severity, as
compared to other eligible veterans with different disabilities.
14  It appears that Martin may have abandoned this theory given that
the evidence shows that during the time of her application the
15  VHCs did not expel veterans already resident in the home who
developed Alzheimer's.  There was some evidence that the Chula
16  Vista home may have had a policy of excluding applicants with
Alzheimer's disease, even if the applicant was otherwise able to
17  function in the residential domiciliary facility ("DOM").
However, although the parties disputed the degree of Dorothy
18  Martin's disability, the weight of the evidence favored a jury
finding that at no relevant time was she qualified for the DOM.
19

20      [3] In the reply brief, Martin argues that "all that is
required under the ADA is that the disability be a 'motivating
21  factor' in the decision to exclude the plaintiff, rather than the
'sole' factor.  (Id. (citing Head v. Glacier Northwest Inc., 413
22  F.3d 1053, 1065 (9th Cir. 2005)).)
     This argument is irrelevant for two reasons.  First, "[a]
23  post-trial motion for judgment can be granted only on grounds
advanced in the pre-verdict motion."  Fed. R. Civ. P. 50(b),
24  Advisory Committee Notes on the 1991 Amendments; see also Murphy
v. City of Long Beach, 914 F.2d 183, 186 (9th Cir. 1990).
25  Because Martin failed fairly to raise this argument previously,
the court cannot address it now.  Second, even if the "motivating
26  factor" standard applied, the jury still could have reasonably
concluded that Dorothy Martin's disability did not "motivate" the

Martin asserts that "[d]efendants' policies are unnecessary, facially discriminatory, and therefore invalid and illegal under the [ADA], the Rehabilitation Act, and the equal protection clause of the 14th Amendment." (Mot. at 3-4.)[4]  The focus of this attack is on the four different care levels and facilities and, more particularly, the VHC policy of reserving 25% of the vacant beds in the higher care levels for existing residents of the DOM. The stated reason for the policy is to assure residents of the DOM that they will not face expulsion if they become infirm and require a space in one of the higher care levels.  The unfortunate result of this otherwise understandable policy is that an eligible veteran like Dorothy Martin, not already a member of a Home, may be denied admission to the higher care levels even though a bed is open.

Several layers of rules and regulations govern the VHC's admission policies.  First, California Military & Veterans Code § 1012 enumerates the eligibility requirements for admittance to one of the VHC homes.  According to § 1012, eligible individuals are those who: (1) served in the U.S. armed forces; (2) were

Department's decision to exclude her, as discussed below.

[4]  Martin also asserts that the policies violate state law because they "impermissibly alter and restrict the scope of the [VHC] eligibility statute (Cal. Mil. & Vets. Code § 1012)." According to Martin, § 1012 requires the VHC to admit any qualified veteran whether or not there is space in the VHC for that veteran.  There are a number of problems with this line of argument: (1) § 1012 does not say this, (2) it is not reasonable to interpret the statute in the manner suggested given that the statute itself envisions that not enough space will be available for all eligible veterans, see Cal. Mil. & Vets. Code § 1012(b)(1), and (3) plaintiffs did not make a claim under § 1012.

honorably discharged from service; (3) are eligible for
hospitalization or domiciliary care in a veterans' facility in
accordance with the rules and regulations of the U.S. Department
of Veterans Affairs; and (4) are bona fide residents of
California at the time of application.  Cal. Mil. & Vet. Code §
1012(a).  Dorothy Martin is eligible for admission to a VHC home
under these criteria.

Second, each VHC home has its own admission policies and
rules.  The rules of all three VHC homes to which Dorothy applied
refer to Alzheimer's as a possibly disqualifying condition for
admittance depending on the severity of the condition.[5]  For
instance, Barstow's admissions policies state that an applicant
whose medical needs "exceed the reasonable resources of the Home
shall be rejected or referred to the Chief Medical Officer for
further review such as . . . (3) diagnosis of Alzheimer's related
Dementia." (Pls.' Ex. 50.)  Similarly, Yountville's policies
state that "[a]n applicant whose medical needs exceed the
reasonable resources of the Home shall be denied, such as . . .
(4) diagnosis of Alzheimer's or dementia whose needs exceed
current resources." (Id. Ex. 52.)  Finally, Chula Vista's
current policies explicitly exclude Alzheimer's patients, listing
Alzheimer's disease as a disqualifying condition for admission.
(Id. Ex. 51.)  However, this policy was not created until
December 2001, one month after Dorothy Martin's death.  (Id.)

---

[5] California Military and Veterans Code § 1044 gives the
VHCs the authority to adopt their own policies.

5

1    In addition to the admissions restrictions, the VHC homes

2    are limited by statute and regulation as to what levels of care

3    they can provide.  All three VHC homes, collectively, offer

4    admissions to four levels of care: Domiciliary ("DOM"),

5    Residential Care for the Elderly ("RCFE"), Intermediate Care

6    ("ICF"), and Skilled Nursing ("SNF").  (Defs.' Trial Br. at 1-2.)

7    The DOM provides the lowest level of care and does not

8    provide nursing services.  (Defs.' Ex. 20 at 1.)  Residents must

9    be entirely independent and able to perform all of the activities

10   of daily living ("ADLs").  (Id.)  The DOM is a group home that

11   provides a social community and activities for independent

12   elderly veterans in a dormitory setting.  The RCFE is the next

13   level of care and provides medication assistance and stand-by

14   assistance for bathing.  (Id. at 2.)  The ICF provides more

15   assistance than the RCFE, but only admits residents who need

16   assistance with no more than two ADLs.  (Id.)  Finally, the SNF

17   provides 24-hour in-patient care, including medical, nursing,

18   dietary, and pharmaceutical services.  (Id.)  Not all four levels

19   of care are offered at all three VHC homes at all times.  (Id. at

20   2-3.)  To be eligible for state and federal funding, each VHC

21   home must obtain a separate license issued by the California

22   Department of Health Services for each level of care at that VHC

23   home.  (Id. at 4, 7, 8.)  CDVA regulations define what services

24   can be provided in each level of care.  Cal. Code Regs. tit. 12,

25   § 503.  Additionally, during the relevant time period, CDVA

26   regulations required that "[n]o direct admission to the [SNF

level of care] is allowed from outside sources except when the [SNF] occupancy rate is below 75%."  Id. § 501.2.

These policies are not facially discriminatory as a matter of law.  First, the ADA does not force a health care provider "to provide extraordinary services which it is not set up to deliver."  Alexander v. Pathfinder, Inc., 906 F. Supp. 502, 507 (E.D. Ark. 1995), judgment aff'd in part, rev'd in part, 91 F.3d 59 (8th Cir. 1996) (finding that discharging a disabled individual from a residential intermediate care facility is not discriminatory if the individual required considerably more medical care than the facility could provide).  As the Alexander court noted,

> [t]he ADA was never intended to prevent a facility, whose 'customers' are all disabled, from limiting the scope of the services it provides to the disabled. Surely all facilities cannot be required to serve disabled individuals with every degree of disability. If that were the case, it would require abandonment of designations such as "intermediate care" and "total care."  As noted, federal regulations are replete with such distinctions; it cannot have been the intent of Congress to prohibit the specialization of facilities which care for the disabled.

Id. at 508.  Therefore, the CDVA's policy to limit the services it provides and to create specialized units of care based on severity of disability is not facially discriminatory under the ADA.  Otherwise, most, if not all healthcare facilities would be facially discriminatory -- a physical rehabilitation center for not offering chemotherapy, a retina institute for not offering hearing aids, a residential nursing facility for not offering an intensive care unit.  Furthermore, the jury could also find from

7

the record that the policy of all the various homes was not to exclude an eligible veteran with a diagnosis of Alzheimer's but only to exclude a veteran with such a diagnosis if her condition was such that the Home could not properly treat it or if the condition required placement in a care level that was unavailable.

The Department's 75% rule is also not discriminatory as a matter of law.  As plaintiffs acknowledge, the VHCs serve to provide long-term care for aged and disabled veterans.  (Mot. at 6.)  Thus, the VHCs have a long-term obligation to their members and may ensure that those members have access to sufficient care throughout their lives.  It was up to the jury to decide whether the 75% rule was a reasonable way to protect existing residents from eviction or was instead a cover for discrimination. Defendants introduced evidence that if the VHCs were forced to accept every new Alzheimer's applicant the Homes would run out of room for existing residents that later develop the disease.[6] Therefore, a jury could conclude that the Department's decision to save room for existing residents rather than to admit new

---

[6]  If one were to follow plaintiffs' argument to its logical conclusion, these discharged residents could also claim that they were excluded "on the basis of disability" in violation of the ADA.  To prevent such claims, the Department would be forced to provide care to all Alzheimer's patients who either resided in the homes or applied for admission to the homes, or shut the homes entirely.  Given the extraordinary growth of Alzheimer's in the veteran and general population, it is likely that the VHCs would be forced to close.  The ADA does not require such a counter-productive result.

1  residents was not discriminatory under the ADA.[7]

2      For these reasons, the court denies plaintiffs' motion for
3  judgment as a matter of law on the grounds that the Department's
4  regulations are facially discriminatory under the ADA or the
5  Rehabilitation Act.

6  B.   "Qualified Individual with a Disability"

7      Plaintiffs assert that "[t]he evidence presented at trial
8  conclusively established that Dorothy Martin was a 'qualified
9  individual with a disability' under the ADA and the
10 Rehabilitation Act."  (Mot. at 8.)

11      A.   Qualified Individual

12      A person is "qualified" if she satisfies all of a program's
13 requirements other than those that are unreasonable and
14 discriminatory.  Jacobson v. Delta Airlines, Inc., 742 F.2d 1202,
15 1205 (9th Cir. 1984).  As discussed above, a reasonable jury
16 could determine that the Department's requirements were not
17 unreasonable or discriminatory.  Therefore, the jury had the
18 responsibility to evaluate whether Dorothy Martin was "qualified"
19 at the time she applied based on these requirements.  Dorothy
20 Martin also would have qualified for a certain level if the
21 Department could have made reasonable accommodations to enable
22 her to qualify for that level at the time she applied.  28 C.F.R.
23 § 35.130(b)(7).

24      At trial, defendant introduced Dorothy Martin's medical
25

26 ────────────────────

     [7]  The analysis under the Rehabilitation Act is the same.

records and her VHC application to demonstrate that she required

assistance with at least 5 ADLs, including bathing, grooming,

dressing, medication, and toileting.  (Def.'s Exs. 1-13, 17.)

From this evidence, the jury could conclude that Dorothy Martin

was only qualified for the SNF facility.

Defendants also presented evidence to show that, at the time

she applied for admission, none of the facilities had SNF beds

available.  The Chula Vista facility was under construction and

the SNF was not yet completed.  (Def.'s Ex. 36.)  Barstow had

lost its certification for its SNF and could not legally receive

government funds for new admissions.  (Def.'s Trial Br. at 2.)

Finally, defendants presented evidence that Yountville was not

accepting outside applicants because the occupancy rate of the

SNF was 81.5% when Dorothy Martin applied in November 2000 and

there were already 45 people on the waiting list for the SNF.

(Pls.' Ex. 37.)  By October 24, 2001, when Mary Martin renewed

her inquiry, the situation had worsened; by then the occupancy

rate was at 75.6% and there were 99 people on the waiting list.

(Def.'s Ex. 37.)

Plaintiffs produced calculations at trial to show that the

actual occupancy rate of the SNF never came close to 75% from

1994 through 2003, given the number of residents at each level of

care and the licensed capacity of the SNF.  (Reply at 8.)

However, defense witness Marcella McCormack testified that

plaintiffs' calculations were incorrect because the licensed beds

were unfunded and could not be used.  (Surreply at 5.)  Moreover,

10

even if the beds could have been used, Yountville would likely have admitted the dozens of people already on the waiting list before it would have admitted Dorothy Martin.

Given this evidence, a reasonable jury could conclude that none of the VHCs had room for Dorothy Martin at the time she applied, and that she was otherwise unqualified for admission.

B.  Reasonable Accommodations

Dorothy Martin is also a "qualified individual" if the Department could have made reasonable modifications to enable her to qualify.  28 C.F.R. § 35.130(b)(7).  The initial burden is on plaintiffs to establish the existence of reasonable modifications.  Zukle v. Regents of Univ. of Cal., 166 F.3d 1041, 1047 (9th Cir. 1999).  This burden is "not a heavy one." Henrietta D. v. Bloomberg, 331 F.3d 261, 280 (2d Cir. 2003). "[I]t is enough for . . . plaintiff[s] to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits."  Id.  Once the plaintiff has done this, "[t]he burden shifts to the [Department] to produce evidence that the . . . accommodation would require a fundamental or substantial modification of its programs or standards." Zukle, 166 F.3d at 1047.[8]

_____

[8] Although Zukle and Henrietta deal with reasonable accommodations under Title III rather than Title II, the burden is the same under both titles.  See McGary v. City of Portland, 386 F.3d 1259, 1266 (9th Cir. 2004) ("Although Title II of the ADA uses the term 'reasonable modification,' rather than 'reasonable accommodation,' these terms create identical standards.")

1   In analyzing whether an accommodation would be a

2   "fundamental alteration," the financial and other logistical

3   limitations on a state's capacity to provide such services must

4   be considered, <u>Townsend v. Quasim</u>, 328 F.3d 511, 519-20 (9th Cir.

5   2003), as well as whether the modification would alter the

6   essential nature of the program or impose an undue burden or

7   hardship in light of the overall program.  <u>Easley v. Snider</u>, 36

8   F.3d 297, 305 (3d Cir. 1994).  The analysis looks not simply at

9   the cost of accommodating the specific plaintiff but rather to

10  whether "immediate relief for the plaintiffs would be

11  inequitable, given the responsibility the State has undertaken

12  for the care and treatment of a large and diverse population of

13  persons with mental disabilities."  <u>Olmstead v. L.C.</u>, 527 U.S.

14  581, 604, 119 S.Ct. 2176 (1999).  The jury was so instructed.

15  Plaintiffs suggested at trial that the Department could

16  have: (1) used all licensed beds or created more; (2) provided

17  dementia care in the lower levels; (3) admitted to the SNF

18  without certification; (4) ignored or eliminated the 75% rule;

19  (5) admitted to a "crowded" SNF on a conditional basis; (6) paid

20  for the care of all eligible veterans at private facilities; or

21  (7) built fences, installed alarms or re-hung gates to make the

22  RCFE suitable for Alzheimer's and dementia patients.  (<u>See</u> Mot.

23  at 12.)

24  The Department introduced evidence that these suggested

25  accommodations would create an undue hardship because the costs

26  of implementing them would financially cripple the Department and

12

prevent it from maximizing the number of veterans it could

assist.   A reasonable jury could conclude from the testimony

that: (1) the VHCs could not reasonably use all licensed beds or

create more beds because they could not afford the nurses to care

for the people who would occupy them; (2) the VHCs could not have

provided dementia care in the lower levels because doing so would

effectively turn those units into SNF units, which require

separate licenses and increased staffing; (3) the VHCs could not

admit to the SNF without certification, because to do so would

violate the law; (4) ignoring or eliminating the 75% rule would

leave current members without beds once their needs increased, as

would admitting to a "crowded" SNF on a conditional basis; (5)

the cost of paying for every disabled veteran's private care

would be prohibitive; and (6) building restrictive structures

like fences would psychologically harm veterans who experienced

the shock of battle and may have been prisoners of war.   In sum,

from this evidence the jury could conclude that the Department

was not able to make any reasonable accommodations to admit

Dorothy Martin.   Judgment as a matter of law for plaintiffs is

not possible.

C.   Exclusion Because of Disability

     Plaintiffs next argue that they are entitled to judgment as

a matter of law because "[t]he evidence presented at trial

conclusively established that Dorothy Martin was excluded from

receiving the benefits of the VHC because of her disability."

(Mot. at 9.)   However, as discussed in subsection A above, a

1  reasonable jury could conclude that she was not excluded because

2  of her disability but because of policies that were not

3  discriminatory.

4  D. "Fundamental Alteration" Defense

5       Plaintiffs assert that the "fundamental alteration" defense

6  does not apply in cases of facial discrimination.  (Mot. at 6

7  (citing Bay Area Addiction Research & Treatment, Inc. v. City of

8  Antioch ("BAART"), 179 F.3d 725, 734-35 (9th Cir. 1999); Lovell

9  v. Chandler, 303 F.3d 1039, 1054 (9th Cir. 2002).)  Even if this

10 were a case of facial discrimination, plaintiffs cannot raise

11 this argument now because they did not raise it in their pre-

12 verdict motion for judgment as a matter of law.  Fed. R. Civ. P.

13 50(b), Advisory Committee Notes on the 1991 Amendments; see also

14 Murphy v. City of Long Beach, 914 F.2d 183, 186 (9th Cir. 1990).

15 In their original motion, plaintiffs merely stated that "[t]he

16 evidence presented at trial also conclusively proved that

17 Defendants' anticipated defenses of undue burden or fundamental

18 alteration are not applicable."  (Pre-verdict Mot. at 5.)

19 Plaintiffs did not argue that they were inapplicable because the

20 Department's policies were facially discriminatory.  Moreover,

21 plaintiffs included the defense in their proposed jury

22 instructions ## 30 and 31.  Although the court does not have a

23 transcript of the jury instruction proceedings, it has no

24 recollection of any objection by plaintiffs to the court's

25 inclusion of the defense in the final jury instructions.  The

26 Ninth Circuit has assumed that the defense applies when

1  plaintiffs fail to challenge its use.   <u>Townsend</u>, 328 F.3d at 518.

2      Plaintiffs also argue that the defense does not apply here

3  because "the necessary factual findings were not made, in

4  writing, by the head of a public agency or their designee."

5  (Mot. at 10 (citing 28 C.F.R. §§ 35.149, 35.150).)  This argument

6  is equally unavailing.  Section 35.150(a)(3) may create a

7  procedural requirement that the head of a department make written

8  findings that a change would result in a fundamental alteration.

9  However, there is no indication that a department head's failure

10 to do so harms particular disabled individuals, in a way that

11 Title II aims to prevent or redress.  <u>See</u> <u>Ability Ctr. of Greater</u>

12 <u>Toledo v. City of Sandusky</u>, 385 F.3d 901, 913-15 (6th Cir. 2004)

13 (holding no private action exists to enforce § 35.150(d)).

14 E.  <u>Dorothy Martin's Emotional Distress Damages</u>

15     Plaintiffs assert that "Dorothy Martin may recover for her

16 own emotional distress suffered during her lifetime, because the

17 California law extinguishing emotional distress damages is

18 inherently hostile to the remedial and deterrent policies

19 underlying § 1983."  (Mot. at 12.)  However, the court entered

20 judgment for defendants on the § 1983, equal protection claim.

21 As discussed below, the court declines now to reverse course and

22 enter judgment for plaintiff Dorothy Martin on this claim.  This

23 issue therefore is moot.  Moreover, were it not, and as the

24 parties are well aware, the court has previously addressed this

25 precise issue in another case and found that the remedies

26 provided by California law are not contrary to the purposes of

15

§ 1983.  <u>Venerable v. City of Sacramento</u>, 185 F.Supp.2d 1128, 1133 (E.D. Cal. 2002).

F.   <u>Mary Martin's Financial and Emotional Distress Damages</u>

Plaintiffs argue that "Mary Martin may also recover for her own financial damages and emotional distress under the ADA and the Rehabilitation Act."  (Mot. at 13.)  Mary Martin asserts that she has "been directly and personally aggrieved and damaged by Defendants' conduct."  (Pls' Compl. ¶ 33.)  According to Mary Martin, she was financially and emotionally burdened with the care of her ailing mother because the VHCs would not admit her.

In certain limited circumstances, non-disabled individuals may claim "associational" discrimination, giving them standing to sue under the ADA and the Rehabilitation Act.  <u>Innovative Health Sys. v. City of White Plains</u>, 117 F.3d 37, 46-47 (2d Cir. 1997) (overruled on other grounds).  However, a non-disabled plaintiff must still show that she "suffered a specific, separate, and direct injury to [herself] caused by defendant's actions."  <u>Glass v. Hillsboro Sch. Dist.</u>, 142 F.Supp.2d 1286, 1288 (D. Or. 2001).  Although there are few opinions on this issue, it appears that courts do not permit a caretaker or relative to bring a claim on his or her own behalf because of discomfort, distress, or loss due to the denial of benefits to some dependent loved one.  <u>See, e.g</u>, <u>Simenson v. Hoffman</u>, 1995 WL 631084 (N.D. Ill. 1995)(no separate claim where doctor "yelled that he would not treat 'that sick child'" in presence of parents); <u>Niemeier v. Tri-State</u>, 2000 WL 1222207 (N.D. Ill. 2000) (husband may not claim damages

16

because of denial of fertility treatment to wife).  Though Mary

Martin allegedly suffered financial loss and emotional distress,

she did not have a separate right to CDVA's services.  Her

attempt to gain access to the VHC related solely to her mother's

care.  Therefore, the court finds that she does not have

independent standing to sue under the ADA and the Rehabilitation

Act.

G.   Equal Protection

     Plaintiffs claim that they are "entitled to judgment as a

matter of law on their § 1983 claims because the policies are

irrational and facially discriminatory, and were applied (or at

least sanctioned) knowingly and intentionally by the individual

Defendants, with (at least) reckless disregard.  Facially

discriminatory admissions *per se* have no rational basis, and thus

cannot pass muster in the Court's equal protection analysis."

(Mot. at 13-14.)  The court granted judgment to defendants on the

equal protection claim before the case was submitted to the jury.

     As already discussed above, a reasonable jury could conclude

that the Department's policies were not facially discriminatory.

Even if they were, disability does not constitute a suspect

classification under the Equal Protection Clause.  Does 1-5 v.

Chandler, 83 F.3d 1150, 1155 (9th Cir. 1996).  Review is under

the rational basis standard, a highly deferential standard that

puts the burden on the plaintiff to negate every conceivable

basis that might support the action.  Rui One Corp. v. Berkley,

371 F.3d 1137, 1155 (9th Cir. 2004).  As discussed above, the

17

Department has presented evidence that it denied admission to
Dorothy Martin because it did not have the resources to care for
her.  A reasonable jury could conclude that plaintiffs did not
present sufficient evidence to negate this assertion.  Therefore,
the court denies plaintiffs' motion for judgment on this issue.

H.  <u>Mary Martin's Standing under § 1983</u>

     Plaintiffs claim that "Mary Martin also has standing to
bring her own claims for damages under 42 U.S.C. § 1983.  (Mot.
at 15.)  However, this issue is moot given the discussion above.

I.  <u>Intentional Infliction of Emotional Distress ("IIED")</u>

     Plaintiffs claim "that they are entitled to recover under a
theory of [IIED], because Defendants' facially discriminatory
policies were, by definition, intentional discrimination." (Mot.
at 16.)  The court granted judgment to defendants on the IIED
claim before the case was submitted to the jury.

     The elements of an IIED claim in California are: (1)
"[e]xtreme and outrageous conduct by the defendant with the
intention of causing, or reckless disregard of the potential for
causing, emotional distress; (2) the plaintiff's suffering severe
or extreme emotional distress; and (3) actual and proximate
causation of the emotional distress by the defendant's outrageous
conduct."  <u>KOVR-TV, Inc. v. Superior Court</u>, 31 Cal.App.4th 1023,
1028 (1995).  "Conduct to be outrageous must be so extreme as to
exceed all bounds of that usually tolerated in a civilized
community."  <u>Id.</u>  (citation omitted).  Plaintiffs assert that
intentional discrimination is *per se* outrageous conduct.  (Mot.

at 16.)

As discussed above, the Department introduced sufficient evidence at trial that it did not discriminate, intentionally or otherwise, against Dorothy Martin based on her disability.  A jury could reasonably find that the Department's decision to deny admission to Dorothy Martin was not outrageous or extreme.  Indeed, a jury could find that the Department's decision was reasonable under the circumstances.  Therefore, the court denies plaintiffs' motion for judgment on this claim.

J.   Negligent Infliction of Emotional Distress ("NIED")

Plaintiffs claim that they "are also entitled to judgment as a matter of law under a theory of negligent infliction of emotional distress."  (Mot. at 16.)   The court also granted judgment to defendants on this claim before the case was submitted to the jury.

"The traditional elements of duty, breach of duty, causation, and damages apply" to an NIED cause of action.  Marlene F. v. Affiliated Psychiatric Med. Clinic, Inc., 48 Cal.3d 583, 588 (1989).  "Whether a defendant owes a duty of care . . . depends upon the foreseeability of the risk and upon a weighing of policy considerations for and against imposition of liability."  Id.  In general, friends and family members may not bring an NIED claim because of the emotional suffering they incur as a result of injury to another.  Such a claim "has been permitted in two types of situations, referred to as 'bystander' and 'direct victim' cases."  Ess v. Eskaton Props., Inc., 97

Cal.App.4th 120, 126-27 (2002) (citing <u>Burgess v. Superior Court</u>, 2 Cal.4th 1064, 1072 (1992)).

Recovery in a bystander case requires Mary Martin to prove that she: (1) is closely related to the victim; (2) was present at the scene of the injury-producing event at the time it occurred and knew that the victim was being injured; and (3) suffered emotional distress beyond what a disinterested witness would likely suffer.  <u>Thing v. la Chusa</u>, 48 Cal.3d 644, 647 (1989).

In typical bystander cases, the plaintiff has suffered a contemporaneous awareness of a sudden accident or injury-causing event.  <u>See e.g.</u>, <u>Hedlund v. Superior Court</u>, 34 Cal.3d 695, 706 (1983) (son recovers when seated next to mother who was shot).

Mary Martin has not alleged that she suffered a similar type of contemporaneous awareness of an injury-causing event.  She has not produced evidence that her mother's health deteriorated suddenly because she was not admitted to one of the VHCs.  Rather, Mary Martin claims that she suffered emotional distress because she "was left with the responsibility of locating, obtaining, overseeing and paying for alternative care for Dorothy." (Pls.' Trial Br. at 20.)  This is not the type of emotional distress claim permitted under a bystander theory of recovery.  Therefore, the Department did not owe Mary Martin a duty under the bystander theory of liability.

To recover as a direct victim, the plaintiff must be a patient of the defendant caregiver.  <u>Ess v. Eskaton Props., Inc.</u>,

97 Cal.App.4th 120, 128 (2002).  A familial relationship with the injured party alone is not sufficient to support a claim.  Id. (sister of injured nursing home patient has no cause of action even though sister was responsible for the placement).  The Department owed a duty to Dorothy Martin, not to her daughter.

Even if the Department owed Mary Martin a duty, the jury could have concluded based on the evidence presented that the Department did not breach that duty.  As discussed previously, defense witnesses testified repeatedly that the VHCs only denied Dorothy Martin admission because they did not have the resources to care for her.  A reasonable jury could conclude from that testimony that the Department's actions were unavoidable and not negligent.  Therefore, plaintiffs' motion for judgment on this claim is denied.

## II.   Motion for New Trial

Plaintiffs raise twenty-two arguments in support of their motion for new trial.  Each argument is discussed under a separate heading below.

A.   Instruction #14:  "Lowest Level of Care"

Plaintiffs claim that:

> [t]he Court committed a prejudicial error of law in
> instructing the jury in its instruction #14 that "You
> should determine the lowest level of care, if any, for
> which Dorothy Martin was a 'qualified individual.'  She
> would have qualified for a certain level of care if she
> met the essential eligibility requirements for that
> level of care at the time she applied."

(Mot. at 19.)

1    This instruction was not erroneous.  In an ADA and

2  Rehabilitation Act claim, the jury must determine whether the

3  individual "satisfies all of a program's requirements other than

4  those that are unreasonable and discriminatory."  Jacobson v.

5  Delta Airlines, Inc., 742 F.2d 1202, 1205 (9th Cir. 1984).  The

6  levels of care were included among the VHCs' requirements.

7  (Pls.' Exs. 50-52.)  The VHCs had the authority to create these

8  requirements under Cal. Mil. & Vet. Code § 1044.  Furthermore, as

9  discussed previously, a reasonable jury could have determined

10 that these requirements were not unreasonable or discriminatory.

11 Therefore, consideration of the levels of care was necessary in

12 determining whether Dorothy Martin was a "qualified individual."

13 See Grubbs v. Med. Facilities of Am., Inc., 879 F.Supp. 588, 591

14 (W.D.Va. 1995) (holding that, when plaintiff could not meet the

15 requirements for the level of care she required, she was not

16 "otherwise qualified").  Moreover, instructing the jury to

17 consider the lowest level of care for which Dorothy Martin was

18 eligible was an instruction that favored plaintiff's contention

19 that she was qualified for the RCFE with modest accommodations.

20 Presumably this is why plaintiffs did not object to the

21 instruction at trial and should not be heard to do so now.[9]

22 B.  Instruction #14: "Reasonable Accommodation or Modification"

23    Plaintiffs assert that:

24

25

26      [9]  Because the court does not have a transcript, it must
   rely on its recollection of whether objection was made at the
   jury instruction conference.

> [t]he Court committed a prejudicial error of law in instructing the jury in instruction #14 that "A reasonable accommodation or modification may include . . . minor alterations to physical facilities."  This instruction misstated the applicable law, because reasonable accommodations are not limited to minor alterations to physical facilities.

(Mot. at 19-20.)

Plaintiffs mischaracterize the instruction.  The instruction included several other possible "reasonable accommodations," such as "job restructuring, modifying an application process, acquisition or modification of equipment or devices, [and] adjustments to training" (all excluded by plaintiffs' elipses).  Moreover, the instruction did not limit it to these possibilities by using the words "*may* include," not "only include."  And, again, the court recalls no objection to this instruction at trial on this ground.

C.  Instruction #15:  Considering the "Level of Care"

Plaintiffs claim that "[t]he Court committed a prejudicial error of law in instructing the jury in its instruction #15 that it should consider 'the Department's decision to deny admittance to a level of care, for which Dorothy Martin was qualified . . .'"  (Mot. at 20.)  As discussed above, the instructions regarding the levels of care were proper and necessary for this claim.

D.  Instruction #15:  Disability as a "Motivating" Factor

Plaintiffs claim that "[t]he Court committed a prejudicial error of law in instructing the jury in its instruction # 15 that

1  " . . . if you find that the Department's standards promote

2  another purpose, the standards may not be discriminatory."  (Mot.

3  at 20.)  Plaintiffs assert that "all that is required under the

4  ADA is that the disability be a 'motivating factor' rather than

5  the 'sole' factor."  (JMOL Reply at 3.)  However, plaintiffs

6  never stated this as a ground of objection to the instructions

7  until its reply brief in support of its renewed motion for JMOL

8  and new trial.  Moreover, in their Proposed Jury Instruction #18,

9  plaintiffs state that the plaintiff's disability must be "*the*

10 determining factor," rather than "*a*" determining factor.  Thus,

11 plaintiffs cannot assert this argument now.  See Fed. R. Civ. P.

12 51(c); Ayuyu v. Tagabuel, 284 F.3d 1023, 1026 (9th Cir. 2002).

13 Further, plaintiffs' Proposed Jury Instruction #36 states that

14 "plaintiffs claim that Dorothy Martin's disability was the sole

15 reason for the defendant's decision not to provide benefits and

16 services to Dorothy Martin."  This seemed to be plaintiffs'

17 theory of the case from the beginning of the litigation.

18 Plaintiffs never provided a mixed motive instruction and it would

19 be unfair to now introduce this new theory that may or may not

20 apply.  Finally, the language under scrutiny does not actually

21 address the issue because it can be understood consistently with

22 plaintiffs' position.  This is probably why, to the court's best

23 recollection, no specific objection was made to this language at

24 trial.

25 E.   Instruction #15: "Some Other Non-Discriminatory Reason"

26      Under the same rationale discussed in Section D, plaintiffs

assert that "[t]he Court committed a prejudicial error of law in instructing the jury in its instruction #15: " . . . if you find that Dorothy Martin was treated differently for some other non-discriminatory reason, the defendant did not engage in discrimination because of her disability and you should find in favor of defendant." (Mot. at 20.)  For the reasons discussed above, plaintiffs cannot assert this argument now.

F.   <u>Instruction #17: Defense of Undue Hardship</u>

Plaintiffs claim that "[t]he Court committed a prejudicial error of law in instructing the jury in its instruction #17 about the defense of undue hardship, which was not available to Defendant as a matter of law. (Nor is undue hardship an absolute defense, as portrayed in the Court's instruction.)"  (Mot. at 20.)

Plaintiffs' argument is flawed among other reasons because the jury never had to consider the defense.  As demonstrated on the jury verdict form, the jury concluded that the Department did not discriminate against Dorothy Martin by reason of her disability. (Verdict Form, Docket # 155.)  The verdict form specifically stated that if the jury made this finding, it should not go on to answer question #2 which asked the jury if the Department had proven any of its defenses.  (<u>Id.</u>)  Therefore, even if it were erroneous to instruct on undue hardship, such an error was harmless and not grounds for a new trial.

G.   <u>Instruction #21: Compensatory Damages</u>

Plaintiffs assert that:

1

2

> [t]he Court committed a prejudicial error of law in
> instructing the jury in its instruction #21 that "An
> award of compensatory damages should be limited to the
> net cost of the Estate of Dorothy Martin of any
> services she was required to obtain as a consequence of
> her denial of admission to a Veterans Home."

3

4

5   (Mot. at 21.)  However, the jury never considered damages because

6   it concluded that the Department did not violate the ADA or the

7   Rehabilitation Act.  Therefore, any error would be harmless.

8   H.   Instruction #21: Emotional Distress Damages

9        Plaintiffs assert that "[t]he Court committed a prejudicial

10  error of law in instructing the jury in its instruction #21 that

11  'you may not award any damages for emotional distress experienced

12  by Dorothy Martin or Mary Martin.'"  (Mot. at 21.)  Again,

13  because the jury never considered damages, any error would be

14  harmless.  Also, as discussed earlier, plaintiffs' claims for

15  IIED and NIED were properly dismissed from the case.

16  I.   Consolidation of Claims Under the ADA and Rehabilitation Act

17       Plaintiffs claim that "[t]he Court committed a prejudicial

18  error of law by consolidating Plaintiffs' claims under the ADA

19  and the Rehab Act, rather than instructing on and submitting each

20  claim to the jury separately."  (Mot. at 21.)

21       The requisite elements of the ADA and the Rehabilitation Act

22  are essentially identical, and the Ninth Circuit has construed

23  them to be co-extensive.  Sanchez v. Johnson, 416 F.3d 1051, 1062

24  (9th Cir. 2005).  Moreover, plaintiffs never asserted this

25  objection when given the opportunity before the jury retired to

26  deliberate.  All parties, particularly plaintiffs, are assisted

1  when the jury instructions are as straightforward as possible.

2  Thus, consolidating the claims for purposes of instruction was

3  proper and helped to simplify the jury's consideration of the

4  evidence.

5  J.  Failure to Instruct on § 1983 Claim

6      Plaintiffs claim that "[t]he Court committed a prejudicial

7  error of law by refusing to instruct the jury on Plaintiffs'

8  claim under 42 U.S.C. § 1983."  (Mot. at 21.)  As discussed

9  above, plaintiffs did not present sufficient evidence to support

10  a § 1983 claim.  Therefore, it was not erroneous to refuse to

11  instruct the jury on this claim.

12  K.  Failure to Instruct on State Law Emotional Distress Claims

13      Plaintiffs claim that "[t]he Court committed a prejudicial

14  error of law by refusing to instruct the jury on Plaintiffs'

15  state law emotional distress claims."  (Mot. at 21-22.)  As

16  discussed above, plaintiffs did not present sufficient evidence

17  to support an NIED or IIED claim.  Therefore, it was not

18  erroneous to refuse to instruct the jury on these claims.

19  L.  Mary Martin's Standing

20      Plaintiffs assert that "[t]he Court committed a prejudicial

21  error of law by not permitting Plaintiff Mary Martin to recover

22  any damages under any theory alleged in the Complaint or proven

23  at trial."  (Mot. at 22.)  As noted previously, Mary Martin did

24  not have standing to recover damages.  Moreover, even if the

25  court erred, the jury never reached the issue of damages because

26

1   it found that the Department did not violate the ADA or the

2   Rehabilitation Act.  (See Verdict Form, Docket # 155.)

3   M.   Removal of Individual Defendants from Consideration

4        Plaintiffs argue that "[t]he Court committed a prejudicial

5   error of law by removing individual defendants Bruce Thiesen,

6   George Andries, Jr., and Marcella McCormack from consideration by

7   the jury as to their liability."  (Mot. at 22.)

8        The court already disposed of this issue regarding the ADA

9   and Rehabilitation Act claims in its July 21, 2003 Order as

10  follows:

11          [p]laintiffs may not bring ADA and Rehabilitation Act
            claims against CDVA officers in their individual
12          capacities, because both statutes are directed at the
            actions of public entities only.  Miranda B. v.
13          Kitzhaber, ---- F.3d ----, 2003 WL 21078049, *5 n.7
            (9th Cir. 2003) (distinguishing ADA suits against state
14          officers in their individual capacities from its
            holding that plaintiff could obtain injunctive relief
15          under ADA against state officers in their official
            capacities); Garcia v. S.U.N.Y. Health Sciences Center,
16          280 F.3d 98 (2d Cir. 2001) ("[N]either Title II of the
            ADA nor § 504 of the Rehabilitation Act provides for
17          individual capacity suits against state officials.");
            Alsbrook v. City of Maumell, 184 F.3d 999, 1005 n.8
18          (8th Cir. 1999) ("['Public entity'] as it is defined
            within the [ADA], does not include individuals.").
19

20  (7/21/2003 Order at 7-8).  Accordingly, the court dismissed

21  plaintiffs' ADA and Rehabilitation Act claims against the

22  CDVA officers named in their individual capacities.  (Id. at

23  8.)

24       Thus, at the time of trial, the individual defendants only

25  remained as to the equal protection and negligence claims.  As

26  discussed above, these claims were properly dismissed as to all

                                  28

defendants.

N.   Failure to Give Plaintiffs' Proposed Instructions

Plaintiffs assert that:

"The Court committed prejudicial errors of law by
refusing to give the following instructions, as
requested by Plaintiffs: Plaintiffs' proposed
instructions 17, 21, 22, 23, 24, 25, 26, 27, 28, 30,
31, 32, 34, 35, 36, 37 and 39-52.  Plaintiffs' proposed
instructions (the complete set numbered 1-52),
submitted in a timely manner and accurately stating the
relevant law, were almost completely disregarded by the
Court, who instead substituted its own set of
instructions presented to counsel at the conclusion of
trial, the very morning the jury was instructed."

(Mot. at 22.)

Despite plaintiffs' assertions, the court did not disregard
plaintiffs' proposed instructions, as it used much of the
language provided by plaintiffs to create the final instructions
presented to the jury.  A fair review of plaintiffs' instructions
shows that they were not ready for delivery to a jury.  It was
the court's responsibility to pull together, at considerable
effort, a set of instructions that would make sense to a lay
jury.  Also, the court has no current recollection of the parties
protesting that they had inadequate time to review the final
instructions or requesting additional time to review them and
make objection.

Plaintiffs have not presented any persuasive argument as to
why the court's jury instructions, as a whole, were misleading or
misstate the law.  Instruction 10 cited the exact provisions from
the ADA and the Rehabilitation Act which explain the prohibition

29

against discriminating on the basis of disability.  Instruction
11 listed the four elements that the plaintiff must prove to
establish ADA and Rehabilitation Act claims.  While plaintiffs
claim that asking the jury to examine the levels of care was
confusing, doing so was necessary to properly evaluate the claim.

Plaintiffs also argue for the first time in their reply
brief that the instructions should have: (1) distinguished
between levels of care for residents versus applicants; and (2)
used the term "dementia" rather than "Alzheimer's."  However,
these arguments are untimely and should not and cannot be raised
now.  Fed. R. Civ. P. 51(c).

O.  Admitting Dr. Arnott's Testimony

Plaintiffs claim that "[t]he Court committed prejudicial
errors of law in improperly admitting the testimony of Dr. Arnott
on the matter of Dorothy Martin's condition and care needs."
(Mot. at 23.)

Plaintiffs first raised this issue in Motion in Limine #1.
They asserted that Dorothy Martin's care needs were irrelevant
because this information was not considered by the VHCs at the
time they reviewed Dorothy Martin's application.  The court
denied the motion finding that Dorothy Martin's medical history
was at least relevant to her claim for damages.  This ruling is
correct; her claim for damages would have depended, at least in
part, on what she would have paid for services had she been
admitted to the VHC versus what she paid on the outside.  The
parties took very different positions on Dorothy Martin's precise

30

care needs when she applied and thereafter.  Moreover, the

testimony was relevant to a central issue in the case: what level

of care was appropriate for Dorothy Martin when she applied?  The

subsequent medical history is relevant to an assessment of her

medical condition at an earlier point in time and to the

credibility of witnesses testifying to that condition.

Accordingly, the decision to admit Dr. Arnott's testimony was

proper.

P.   Admitting Exhibits 1-18 on Dorothy Martin's Needs

     Plaintiffs assert that "[t]he Court committed prejudicial

errors of law in improperly admitting Defendants' Exhibits # 1-

18, on the matter of Dorothy Martin's condition and care needs."

(Mot. at 23.)  However, the court's decision was proper for the

reasons discussed in Section O.

Q.   Refusing to Admit Bob Taylor's Testimony

     Plaintiffs claim that "[t]he Court committed prejudicial

errors of law in improperly refusing to admit testimony and

documentary evidence regarding the statements of Bob Taylor to

the effect that the Veterans Home of California did not accept

applicants with Alzheimer's disease."  (Mot. at 23.)

     Bob Taylor was a County Veterans Service Officer assigned to

the Yountville VHC in 1998.  Mary Martin sought to testify that

Taylor told her in 1998 that "the VHC does not and would not

admit applicants with Alzheimer's disease."  (Def.'s Mot. in

Limine #3 at 2.)  This statement would be offered for the truth

of the matter stated.  Defendants moved to exclude any statements

made by Taylor because the statements were hearsay and not
admissible as party-opponent admissions.  (<u>Id.</u>)   More
specifically, they asserted that: (1) Taylor was not authorized
by defendants to make statements regarding admissions; and (2)
the statements were not within the scope of Taylor's agency or
employment.  (<u>Id.</u> at 3.)   Plaintiffs had the burden to prove
otherwise.  See <u>Brenenman v. Kennecott Corp.</u>, 799 F.2d 470, 473
(9th Cir. 1986) ("Rule 801(d)(2)(D) requires the proffering party
to lay a foundation to show that an otherwise excludable
statement relates to a matter within the scope of the agent's
employment.").

     In opposition, plaintiffs asserted that Taylor's statements
were indeed party-opponent admissions.  (Opp'n to Def.'s Mot. in
Limine #3 at 2.)   They claimed their exhibits showed that the
Department "routinely refers applicants and their families to
[County Veterans Service Officers ("CSVOs")] (such as Taylor) for
assistance with the admissions process."  (<u>Id.</u> at 3 (citing Pls.'
Exs. 42, 144(f).)   Upon hearing these arguments, the court
allowed the Department to submit additional evidence to prove
Taylor was not authorized to discuss admissions, and the court
held an additional hearing on the issue.  (10/11/2006 Tr. of
Mots. in Limine at 12.)

     The Department then filed the declaration of Marcella
McCormack, the Administrator of the Yountville Home.  (McCormack
Decl. at 2.)   McCormack stated that Veterans Services
Representatives like Bob Taylor are not: (1) responsible for

1   addressing questions from prospective members regarding

2   admissions polices; (2) part of the Admissions Screening

3   Committee; or (3) briefed as to admissions policy.  (Id.)

4   Attached to her declaration was a duty statement stating that

5   Taylor's duties included, among other things: (1) interviewing

6   and counseling Veterans Home members on federal and state

7   veterans benefits; (2) assisting in application completion; and

8   (3) participating in member admissions screening.  (Id. Ex. 2.)

9       Ultimately, the court decided to exclude the evidence.

10  Nevertheless, the court's current recollection is that much of

11  the testimony came in anyway without objection.  Even if it did

12  not come in, and the court erred in excluding it, the error would

13  be non-prejudicial.  The parties have agreed that the VHCs did

14  not admit new Alzheimer's patients with severe dementia; indeed,

15  the VHCs did not admit any veterans who required placement in the

16  SNF.  Plaintiffs may have had the theory that the VHCs did not

17  admit Alzheimer's patients whose symptoms were so mild that they

18  would qualify for the RCFE.  But Taylor's cryptic statements were

19  not sufficiently precise to be probative of this issue.

20  R.  Refusing to Admit Plaintiffs' Exhibits 130-135

21      Plaintiffs assert that "[t]he Court committed prejudicial

22  errors of law in improperly refusing to admit Plaintiffs'

23  Exhibits 130-135 . . . after these exhibits had already been

24  presented during the trial, without objection by Defendants."

25  (Mot. at 23.)

26      Plaintiffs' exhibits 130-135 include legislative history for

                                    33

1  bills AB 324 (1997) and SB 630 (1999).  Both of these bills

2  address the needs of the Veterans Homes.  Specifically, AB 324

3  sets out to ensure that veterans' homes meet "the staffing,

4  licensure, and other requirements necessary to provide health

5  care and related services to members of the home who are

6  afflicted with Alzheimer's Disease or other related dementia

7  diseases."  (Pls.' Ex. 132.)  SB 630 authorizes a financing plan

8  to fund construction or renovation of the veterans' homes.

9  (Pls.' Ex. 135.)

10      The legislative history for each of the bills states that

11  the veterans' homes do not accept new Alzheimer's patients.

12  Hearing notes for AB 324 from the Assembly Committee on

13  Governmental Organization state that the bill's author "contends

14  that 'If a person is already in a Veterans' Home and develops

15  dementia, he/she can stay.  But if you have a dementia related

16  disease and want to get in a Vet home, you cannot.'"  (Pls.' Ex.

17  132.)  The notes also say that, "[a]ccording to the DVA, the

18  Homes do not currently admit veterans with Alzheimer's because

19  they do not have the capacity to adequately provide the

20  appropriate care."  (Id.)  Hearing notes from the Senate

21  Committee on Veterans Affairs state that "[t]he Veterans

22  Department does not at present admit veterans with Alzheimer's

23  disease to the home at Yountville, stating that they do not

24  currently have the capacity to provide adequate care."  (Pls.'

25  Ex. 134.)  Finally, the bill text of SB 630 states that "[t]he

26  general policy of the department is to not accept veterans into

existing veterans' homes who suffer from Alzheimer's disease or other diseases causing dementia."  (Pls.' Ex. 135.)

These exhibits contain inadmissible hearsay.  Rule 803(8) provides an exception for public records and reports.  However, plaintiffs must prove that the facts stated in the documents were "within the personal knowledge and observation of the recording official or his subordinates."  Colvin v. United States, 479 F.2d 998, 1003 (9th Cir. 1973)).  "Since the official documents are a substitute for the personal appearance of the official in court, it is generally held that such documents, to be admissible, must concern matters to which the official could testify if he were called to the witness stand."  Indep. Iron Works, Inc. v. U.S. Steel Corp., 322 F.2d 656, 672 (9th Cir. 1963).  "Reports based upon general investigations and upon information gleaned second hand from random sources must be excluded."  Id.

Three of the four statements above state that the information came from another source - either the Department or the author of the bill.  The fourth statement does not refer to any source at all.  At trial, the Department adamantly denied that it had the policy it supposedly had admitted to.  Because plaintiffs did not present any evidence or make any proffer showing that the information was within the recording official's personal knowledge, or the source of that knowledge, the court found that the exhibits were hearsay.  On reconsideration, this ruling appears correct.

S.  Exclusion of Plaintiffs' Exhibit 156

1    Plaintiffs assert that "[t]he Court committed prejudicial

2 errors of law in improperly excluding Plaintiffs' Proposed

3 Exhibit 156 and precluding Plaintiffs from eliciting any

4 testimony about the Department's change to its 75% restriction."

5 (Mot. at 24.)

6    Section 503 of the California Code of Regulations governs

7 admissions to the SNF at Veterans Homes.  This section was

8 amended on February 16, 2005 and changed the standard of

9 admission.  The old version precluded outside admission unless

10 the occupancy rate fell below 75%.  The amended version precludes

11 direct admission if the admission would prevent a current

12 resident of the Veterans Homes from entering the SNF.  The

13 Department sought to exclude evidence of the change because it

14 was: (1) irrelevant since the changes were made long after

15 Dorothy Martin passed away; (2) an inadmissible subsequent

16 remedial measure under Rule 407; and (3) prejudicial.  (Def.'s

17 Mot. in Limine #2 at 2.)

18    In opposition, plaintiffs asserted that the evidence should

19 be admitted under the feasibility exception.  (Opp'n to Def.'s

20 Mot. in Limine #2 at 2.)  However, Rule 407 states that the

21 feasibility exception only applies if feasibility is

22 controverted, which it was not.  (Def.'s Mot. in Limine #2 at 2.)

23    Alternatively, plaintiffs asserted that the impeachment

24 exception should apply.  (Opp'n to Def.'s Mot. in Limine #2 at

25 2.)  They contended that the Department has repeatedly claimed

26 that "the 75% restriction was reasonable, necessary, and had a

rational basis." (Id.)  However, when the Department changed the law, it stated to the California Office of Administrative Law that the regulation "is considered by the Department to be arbitrary and too severe a restriction, and is not in the best interests of the veterans of California . . . ." (Id.)  This, they argued, could impeach the Department's previous claims and demonstrate that the 75% rule was unnecessary and had no rational basis. (Id.)

During the motion in limine hearing, the court ruled that the evidence was: (1) not relevant because of the passage of time; and (2) barred by the policy of Evidence Rule 407. (Tr. at 4.)

Rule 407 provides that "evidence of [] subsequent [remedial] measures is not admissible to prove negligence, culpable conduct, a defect in a product, a defect in a product's design, or a need for a warning or instruction."  Fed. R. Evid. 407.  This rule arises from the policy that defendants should be encouraged to make improvements without being afraid that those improvements will be used as evidence against them.  Albrecht v. Baltimore & Ohio R.R. Co., 80 F.2d 329, 332 (4th Cir. 1987).

The evidence that plaintiffs' hoped to introduce regarding the change in the 75% rule is evidence of a subsequent remedial measure that does not fall under the impeachment exception. The Department may well have believed that the 75% rule was reasonable and appropriate at the time it reviewed Dorothy Martin's application.  Evidence that the Department subsequently

changed its view and decided that the rule was arbitrary and too severe a restriction does not impeach the Department's previous position that the restriction was reasonable.  The two views can co-exist.  Furthermore, to permit evidence of policy changes and the reasons given, under the impeachment exception, would contradict the policy of Rule 407, particularly as applied to a public agency which should not be deterred from changing its policies and explaining those changes to the citizenry. Accordingly, the court does not find that it misapplied Rule 407 or abused discretion.

T.  Allowing Defense Counsel "to Improperly Joke with the Judge"

Plaintiffs argue that:

[t]he Court committed a prejudicial error of law by permitting Defendants' attorney, Mr. McCardle, to improperly joke with the judge during his closing argument.  Mr. McCardle was "attempting to curry the favor of the jury by complimenting them, stating that they often had more 'common sense' than the attorneys or the judge, specifically referring and gesturing to the judge."  Instead of rebuking counsel for this attempt to ingratiate himself with the jury and portray himself as friendly with the Court, the Court chuckled and allowed Mr. McCardle to continue his presentation uninterrupted.  This exchange gave the jury the impression that the Judge and Defendants were on the same team.

(Mot. at 24.)

The court has no recollection of chuckling or smiling but will assume that it did.  Surely the court smiled at plaintiffs' counsel at some point during the trial and closing arguments. Indeed, all counsel treated one another and the court with unfailing courtesy throughout the trial in the presence of the

jury.   There was no reason to rebuke defense counsel for this offhand reference to the court.

U.   Defendants' Motion for Judgment as a Matter of Law

Plaintiffs assert that:

[d]espite expressing concerns on the record over fairness and the improper timing of the issues raised in Defendants' Motion for Judgment as a Matter of Law, the Court ultimately granted Defendants virtually everything they requested in their motion.  When all was said and done, the Court failed to give due weight to the prejudice to Plaintiffs and did not preclude Defendants from bringing any claim they could think of, and several arguments actually suggested by the Court, many for the first time.

(Mot. at 24.) Plaintiffs claim that this "further reflect[s] that the Court appeared to craft, and virtually compel, the conclusion of this case in favor of Defendants."  (Id. at 26.)   Plaintiffs also claim that defendants waived their rights to assert the arguments made in the motion for JMOL because the arguments were affirmative defenses.  (Opp'n to Def.'s Mot. for JMOL at 3 (citing 999 v. C.I.T. Corp., 776 F.2d 866, 871 (9th Cir. 1985); 389 Orange Street Partners v. Arnold, 179 F.3d 656, 663, n.3 (9th Cir. 1999)(citing Grabner v. Willys Motors, Inc., 282 F.2d 644, 646 (9th Cir. 1960)); Brannan v. United Student Aid Funds, Inc., 94 F.3d 1260, 1266 (9th Cir. 1996); Fed. R. Civ. P. 8(c)).

Although the Department sought to dismiss several of plaintiffs' claims in its motion for JMOL, the court only dismissed some of the claims.  Those are the claims that are relevant here.  The court dismissed: (1) the ADA, Rehabilitation

Act, and equal protection claims raised by Mary Martin because she did not have standing; (2) the compensatory damages claims for violations of the ADA and the Rehabilitation Act because plaintiffs did not provide evidence of intentional discrimination; (3) the equal protection claim raised by Dorothy Martin's estate because plaintiffs failed to show that the Department had no rational basis for its actions; (4) the emotional distress claims raised by Dorothy Martin's estate because they are barred by California's survival statute; and (5) the emotional distress claims raised by Mary Martin because the Department did not owe her a duty.  The court's dismissal of these claims was proper.  Indeed, the standing issue raised a question of jurisdiction.  While it was unfortunate that the defendants did not make appropriate pre-trial motions to dismiss, there was no prejudice to plaintiffs that the motions were made at trial.  There was no waiver by the Department because the arguments advanced were not in the nature of affirmative defenses.  The court could not permit legally baseless claims to go to the jury.  However, Dorothy Martin's disability claim, which is the essence of the case, did go forward and was fully and fairly presented.

V.   The Verdict

       Finally, plaintiffs assert that "[t]he verdict is against the great weight of the evidence."  However, the discussion above regarding the motion for JMOL demonstrates that the verdict was clearly not against the weight of the evidence.

III.   <u>Bill of Costs</u>

Defendants seek to recover $7,865.91 in costs.  Plaintiffs assert that defendants are barred from recovering their costs under <u>Brown v. Lucky Stores, Inc.</u>, 246 F.3d 1182 (9th Cir. 2001). For the reasons stated below, the court denies the Department's claim for costs for the ADA claim and grants its claim for costs for the Rehabilitation Act, civil rights, and emotional distress claims.

A.   <u>ADA</u>

Fed. R. Civ. P. 54(d)(1) provides that a prevailing party is entitled to recover its costs absent a contrary direction from the court, the rules, or a federal statute.  In <u>Brown</u>, the Ninth Circuit held that costs should be awarded to a prevailing defendant in an ADA action only if the action "was frivolous, unreasonable, or without foundation."  246 F.3d at 1190 (citing <u>Christiansburg Garment Co. v. A. Teichert & Son, Inc.</u>, 127 F.3d 1150, 1154 (9th Cir. 1997)).  Because this action was not frivolous, it follows that defendants cannot recover costs incurred defending against the ADA claim.  The Department concedes this point with regard to Dorothy Martin's ADA claim. However, it asserts that Mary Martin's ADA claim was unreasonable and without foundation because she did not have standing.  (Reply at 4.)

A claim is unreasonable and without foundation if "a reasonable inquiry into the applicable facts and law before filing their case they would have discovered the insufficiency of

41

1  their . . . claim." <u>Margolis v. Ryan</u>, 140 F.3d 850, 854 (9th

2  Cir. 1998).   Under this standard, Mary Martin's ADA claim was not

3  frivolous.   In certain circumstances, non-disabled individuals

4  may claim "associational" discrimination, giving them standing to

5  sue under the ADA.   <u>Innovative Health Sys. v. City of White</u>

6  <u>Plains</u>, 117 F.3d 37, 46-47 (2d Cir. 1997) (overruled on other

7  grounds).   In those cases, the non-disabled individual must show

8  that she "suffered a specific, separate, and direct injury to

9  [herself] caused by defendant's actions." <u>Glass v. Hillsboro</u>

10 <u>Sch. Dist.</u>, 142 F.Supp.2d 1286, 1288 (D. Or. 2001).   Plaintiffs'

11 reasonable inquiry into the facts and law could have led them to

12 conclude that Mary Martin suffered such an injury because she had

13 to pay for alternate care for her mother.   Although her claim is

14 ultimately not supportable, "very few published opinions address

15 this issue," <u>Glass</u>, 142 F.Supp.2d at 1287 n.2.   Therefore, Mary

16 Martin's ADA claim was not frivolous.   The court notes that

17 defendants must not have deemed the claim frivolous during the

18 period for pre-trial motions since no motion to dismiss Mary

19 Martin's ADA claim on this ground was made.   Accordingly, the

20 court denies the Department's request for costs on plaintiffs'

21 ADA claim.

22 B.   <u>Rehabilitation Act</u>

23     Plaintiffs claim that the <u>Christiansburg</u> test should also

24 apply to an award of costs under the Rehabilitation Act since the

25 Act also treats attorney's fees and costs as parallel.   (Opp'n to

26 Bill of Costs at 2.)   However, plaintiffs point to no precedent,

1  nor could the court find any, to support this contention.

2  Indeed, the language of the Rehabilitation Act seems to support

3  the opposite conclusion.  The Rehabilitation Act attorney's fee

4  provision allows the prevailing party "a reasonable attorney's

5  fee as part of the costs,"  29 U.S.C. § 794a(b), whereas the ADA

6  allows the prevailing party "a reasonable attorney's fee,

7  including litigation expenses, and costs."  Thus, under the

8  Rehabilitation Act, attorney's fees are considered "part of the

9  costs" rather than a separate recovery.

10      In that regard, the Rehabilitation Act is more similar to

11  the attorney's fee provision for Title VII, which also allows the

12  prevailing party "a reasonable attorney's fee . . . as part of

13  the costs."  42 U.S.C. § 2000e-5(k).  In Title VII cases, the

14  Christiansburg test does not apply to an award of costs, even

15  though it applies to an award of attorney's fees.  Nat'l Org. for

16  Women v. Bank of Cal., 680 F.2d 1291, 1294 (9th Cir. 1982).  The

17  Ninth Circuit reasoned that "[t]here is no express statutory

18  provision for applying Christiansburg to cost awards, and we see

19  no reason to impose rigid limitations on the district court's

20  discretion."  Id.  This same reasoning would seem to apply to an

21  award of costs under Title II, given the similarity of language

22  between the two statutes.  See Halasz v. Univ. of New England,

23  821 F.Supp. 40, 42 (D. Me. 1993)( "[i]t is clear from the wording

24  of section 794a(b), which permits attorney's fees as a

25  discretionary element of costs, that Congress intended the costs

26  of litigation to be awarded generally as a matter of course in

43

Rehabilitation Act cases as they are under . . . Rule 54.").

In light of this case law, the court finds that Rule 54 rather than the <u>Christiansburg</u> test applies to an award of costs under the Rehabilitation Act. Accordingly, the Department's request for costs under this claim is granted.

C. <u>Section 1983 and Emotional Distress Claims</u>

Plaintiffs present no argument why Rule 54 should not also apply to its civil rights and emotional distress claims. Therefore, the court awards costs to the Department for these claims as well.

D. <u>Apportionment of Costs</u>

The award of costs "rests within the sound discretion of the trial judge." <u>EEOC v. Pierce Packing Co.</u>, 669 F.2d 605, 609 (9th Cir. 1982). This case involved four main claims under the ADA, the Rehabilitation Act, Section 1983 and California tort law. However, the ADA claim was the central claim. Because the Department cannot recover costs for the ADA claim, and because it was the focus of the litigation, the court awards 50% of its total request, or $3,932.95.

////

////

////

////

////

////

IV.

    For the reasons stated above, plaintiffs' motions for judgment as a matter of law and for new trial are DENIED. Defendants are awarded costs in the amount of $3,932.95.

    IT IS SO ORDERED.

Dated: 8/31/2006


_____

DAVID F. LEVI
United States District Judge